UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD RAPHAEL,<br><br>      Plaintiff,<br><br>v.<br><br>NBA PROPERTIES, INC.,<br>GETTY IMAGES (US), INC., and<br>PHOTO FILE, INC.,<br><br>      Defendants. | Civil Action No. 05-CV-11617-MLW |

**DECLARATION OF CARMIN ROMANELLI IN
SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE**

I, Carmin Romanelli, hereby declare and state as follows:

1. This declaration is offered in support of the Motion to Transfer Venue by Defendants NBA Properties, Inc. ("NBA Properties"), Getty Images (US), Inc. ("Getty Images"), and Photo File, Inc. ("Photo File").

2. I currently reside in Glenwood, New Jersey, located within the greater New York City metropolitan region. Glenwood is approximately 57 miles from New York City and approximately 240 miles from Boston, Massachusetts.

3. In January of 1993, I began my career at NBA Entertainment as Manager of NBA Photos, a division of NBA Entertainment. In or around October of 1995, I was promoted to Director of NBA Photos. I was promoted to Senior Director of NBA Photos in or around October of 2001, and I remained at this position until I left the company in February of 2004. In or around December of 1998, NBA Entertainment merged with, and became a division of, NBA Properties. The status and operations of NBA Photos did not change as a result of the 1998 merger between NBA Entertainment and NBA Properties.

4.  On or around October 1, 1995, NBA Entertainment, through my signature, and Richard Raphael entered into a letter agreement (the "October 1995 Agreement"). I was the person primarily responsible for negotiating the deal between Mr. Raphael and NBA Entertainment. During such time, I had numerous telephone communications with Mr. Raphael to discuss and negotiate the terms of the October 1995 Agreement. Specifically, we discussed NBA Entertainment paying Mr. Raphael a thirty-thousand dollar ($30,000) advance to become the exclusive licensor of his photographs to third parties and for his assignment to NBA Entertainment the copyright and all other rights in and to all of his NBA photographs upon his death. We also discussed NBA Entertainment taking possession of Mr. Raphael's photographs and cataloging and housing his photographs at NBA Entertainment's offices in Secaucus, New Jersey. I was located at NBA Entertainment's office for most, if not all, of these telephone conversations.

5.  During the negotiations for the October 1995 Agreement, I met with Mr. Raphael for an entire day at NBA Entertainment in Secaucus, New Jersey. While at NBA Entertainment, Mr. Raphael spent the day touring NBA Entertainment's operations, meeting with various staff, and viewing the location where his photographs would be cataloged and housed after their transfer to NBA Entertainment pursuant to the October 1995 Agreement. In fact, I spent an extensive amount of time explaining to Mr. Raphael how NBA Entertainment would organize his photographs, the process NBA Entertainment would undertake to assign a unique identifier and bar code for each of his photographs, and how NBA Entertainment would use such bar code to track each of his photographs. I also showed Mr. Raphael the specific drawers that would be dedicated to his collection of photographs. During the course of these negotiations, I also met with Mr. Raphael at his office on occasions when I happened to be in Boston in connection with

other business deals or events. On each of these occasions, my primary reason for being in Boston was unrelated to Mr. Raphael.

6. After NBA Entertainment and Mr. Raphael entered into the October 1995 Agreement, I had several communications by telephone with Mr. Raphael to arrange for the transfer of his collection to NBA Entertainment pursuant to such agreement. On more than one occasion, I made arrangements to rent a van in New Jersey and hire persons from New Jersey, who were knowledgeable on the proper way to pack photographs, to travel to Mr. Raphael's office in Boston, pack up his photographs, and drive such photographs to NBA Entertainment's office for storage and cataloging. However, Mr. Raphael cancelled each of these scheduled appointments, and, consequently, did not provide his collection of NBA photographs to NBA Entertainment pursuant to the October 1995 Agreement. I was located at NBA Entertainment's office for most, if not all, of these telephone conversations.

7. In addition, I reviewed and approved periodic statements indicating the remaining balance of the thirty-thousand dollar ($30,000) advance NBA Entertainment paid to Mr. Raphael pursuant to the October 1995 Agreement. Under my direction, and to the best of my knowledge, such periodic statements were sent to Mr. Raphael by an NBA Entertainment administrator. NBA Entertainment prepared and sent the same type of periodic statements to each of the photographers it entered into an agreement with. Such statements were sent for periods from October 1, 1996 through July 31, 1997; August 1, 1997 through July 31, 1998; August 1, 1998 through July 31, 1999; and August 1, 2000 through September 30, 2000, and indicate revenue generated from the licensing of Mr. Raphael's photographs. In fact, I had specific conversations with Mr. Raphael regarding his disappointment in the amount of revenue generated as a result of NBA Entertainment licensing his photographs. I explained to Mr. Raphael that NBA

Entertainment would have the ability to earn more revenue if he would allow NBA Entertainment access to his entire NBA collection as required by the October 1995 Agreement. I was located at NBA Entertainment's office for most, if not all, of these telephone conversations.

8. On or about August 1, 1998, NBA Entertainment and Mr. Raphael entered into an agreement regarding Mr. Raphael's performance of certain photograph assignments for NBA Entertainment and/or NBA teams between August 1, 1998 and July 31, 1999 (the "August 1998 Agreement"). I discussed the details of the August 1998 agreement with Mr. Raphael before he signed it. I was located at NBA Entertainment's office for most, if not all, of these discussions.

9. During my employment at NBA Entertainment, I supervised Marc Seigerman from the time that he started at NBA Entertainment in or around April of 1993 until he left NBA Entertainment in or around March of 1998. Mr. Seigerman began his career at NBA Entertainment as an Assistant in NBA Photos until he was promoted to Coordinator of NBA Photos in or around October of 1995. As both the Assistant and Coordinator, Mr. Seigerman was in charge of NBA Entertainment's photography library. Specifically, Mr. Seigerman was the person primarily responsible for cataloging, assigning NBA Entertainment bar code numbers to, and storing photographs owned and/or controlled by NBA Entertainment, including Mr. Raphael's NBA photographs pursuant to the October 1995 Agreement. During Mr. Raphael's tour of NBA Entertainment's office, I introduced Mr. Seigerman to Mr. Raphael when we toured NBA Entertainment's photography library.

10. Mr. Seigerman currently resides in Westfield, New Jersey, which is located within the New York City metropolitan area. Westfield is approximately 24 miles from New York City and approximately 240 miles from Boston, Massachusetts.

11. Following my employment at NBA Entertainment, I was hired by Getty Images as Vice President of Sports Business Development, One Hudson Square, 75 Varick Street, New York, New York, which is located less than one mile from the United States District Court for the Southern District of New York in New York City.

12. As Vice President of Sports Business Development, I develop and manage sports business relations with sports leagues and governing bodies in the North and South America sales regions to secure commercial photography distribution rights worldwide. I also service Getty Images sales executives who coordinate Getty Images' licensing of photographs to third parties. I further manage and coordinate sports sales for Getty Images, which includes marketing the images of various sports figures, managing sales executives, and sales of sports products. I currently manage a staff of nine people. I am a member of the Senior Leadership Team, which oversees and manages approximately 100 sales representatives in Getty Images' New York City office. I am also a member of the Senior Management Team, which oversees and manages approximately 300 employees in Getty Images' New York City office.

13. In or around October of 2001, Getty Images entered into an agreement with NBA Properties whereby Getty Images agreed to pay NBA Properties a fee for the right to license photographs owned or controlled by NBA Properties to third parties (the "October 2001 Getty Images Agreement"). I am responsible for the relationship between Getty Images and NBA Properties, and, therefore, I am knowledgeable about the contracts between Getty Images and NBA Properties. Specifically, I was involved with the negotiation and implementation of any contracts entered into between Getty Images and NBA Properties, and I monitor the activities relating to performance of such contracts. I am also knowledgeable as to the details of Getty Images' sales reports for images licensed on the Getty Images website and by Getty Images

5

account executives, and NBA Photo Store sales. A true and correct copy of excerpts from the confidential October 2001 Getty Images Agreement (with redactions) is attached hereto as Exhibit 1.

14. This October 2001 Getty Images Agreement contains a New York choice of law provision and a jurisdiction clause requiring the parties to submit to the non-exclusive jurisdiction of any federal or state court of competent jurisdiction located within New York City. *See* Exh. 2 at 2.

15. Around the time that Getty Images entered into the October 2001 Getty Images Agreement, Mr. Seigerman became the Brand Manager for the NBA at Getty Images. As Brand Manager, Mr. Seigerman is the liaison between NBA Properties and Getty Images for any service Getty Images provides to NBA Properties and is responsible for maintaining relationships with sponsors and/or licensees that utilize NBA photography through Getty Images. Specifically, Mr. Seigerman is responsible for overseeing the agreement between Getty Images and Photo File. To the best of my knowledge, Mr. Seigerman has records relating to photographs that Photo File has downloaded and used from Getty Images.

16. In or around December of 2003, Getty Images entered into an agreement with Photo File whereby Photo File became a non-exclusive licensor of photographs owned and/or controlled by Getty Images from October 1, 2003 through September 30, 2006 (the "2003 Photo File Agreement"). The 2003 Photo File Agreement contains a New York choice of law provision and a jurisdiction clause requiring the parties to submit to the exclusive jurisdiction in the Supreme Court of New York County or the Southern District of New York.

17. Over the past six to twelve months, I have had several telephone communications with Mr. Raphael relating to his photographs. Specifically, Mr. Raphael called me to ask

whether Getty Images was interested in entering into an agreement with him whereby Mr. Raphael would provide Getty Images with his entire photography collection for a fee and Getty Images would have the right to license his photographs to third parties. To be clear, I explained to Mr. Raphael that it was impossible for Getty Images to enter into such an agreement relating to his NBA photographs in light of his October 1995 Agreement with NBA Properties. I did, however, express a willingness to discuss the possibility of obtaining rights to his football, baseball, hockey, and other sports photographs. At no time did Getty Images ever attempt to enter into a deal with Mr. Raphael to license his NBA photographs. During this time, Getty Images was already licensing Mr. Raphael's photographs through the October 2001 Getty Images Agreement. I was located in Getty Images' New York City office for most, if not all, of these telephone conversations.

18.     It would be significantly more convenient for me if the trial of this action proceeds in the New York City, as opposed to Massachusetts. I drive to New York City each day for work, while the flight to Boston from Newark Airport, in New Jersey, or LaGuardia Airport, in Queens, New York is approximately an hour to an hour and a half, exclusive of the time to travel to the airport and the time to check-in and go through airport security.

19.     More importantly, I am a single parent and primary caregiver of five children, all of whom are school age. All of my children, whose ages range from five to fourteen years old, reside with me. Therefore, I try to avoid unnecessary travel in order to be within driving distance in case of emergency. Given my family situation, it would be significantly more convenient for me if the trial of this action proceeds in New York City, as opposed to Massachusetts.

7

20.     To the best of my knowledge, any records and/or documented information within Getty Images' possession, custody, or control that are potentially relevant to this litigation are located in facilities in New York City, Seattle, and Los Angeles. However, a majority of such records and/or documented information can be accessed from Getty Images' office in New York City. Examples of such records and/or documented information include without limitation: copies of images of photographs that were taken by Mr. Raphael; sales records, invoices, and/or electronic databases containing records or information relating to photographic images licensed or otherwise used by Getty Images, including copies of Internet pages that no longer appear on Getty Images' website; agreements between Getty Images and NBA Properties and agreements between Getty Images and Photo File; and any correspondence and/or emails between Getty Images and NBA Properties, Photo File, and/or Getty Images' customers.

Signed under the pains and penalties of perjury this 23 day of December, 2005.

_____
Carmin Romanelli

# AGREEMENT

The parties to this agreement ("Agreement"), effective as of October 1, 2001 (the "Effective Date"), are NBA Entertainment, a division of NBA Properties, Inc. ("NBAE"), WNBA Enterprises, LLC ("WNBAE") and NBDL Enterprises, LLC ("NBDLE"; and, together with NBAE and WNBAE, the "NBA Parties") on the one hand, and Getty Images, Inc. ("Getty") and Getty Images (US), Inc. ("Getty US"; and, together with Getty, "Licensee"), on the other hand.

**REDACTED**

**REDACTED**

3. TERM.

(a)  The term of this Agreement (the "Term") initially shall be five (5) years commencing on October 1, 2001 and concluding on September 30, 2006. Each year-long period during the Term commencing on October 1 and concluding on the following September 30 shall constitute a "Contract Year" (e.g., the period commencing October 1, 2001 and ending on September 30, 2002 shall be the "First Contract Year"; the period

beginning October 1, 2002 and ending September 30, 2003 shall be the "Second Contract Year", etc.).

**REDACTED**

**REDACTED**

21. **MISCELLANEOUS**.

**REDACTED**

(b) This Agreement shall be governed by the laws of the State of New York without giving effect to the conflicts of laws principles thereof, and each party hereto irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of any federal or state court of competent jurisdiction located within the City of New York in any action or proceeding arising out of or relating to this Agreement. Each party hereto further irrevocably and unconditionally consents to service of process by registered mail.

**REDACTED**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers as of the date first written above.

GETTY IMAGES, INC.

By: *[signature]*
Name: N. EVANS-LOMBE
Title: SVP NEWS, SPORT + BUSINESS DEVT

GETTY IMAGES (US), INC.

By: *[signature]*
Name: N. EVANS-LOMBE
Title: SVP NEWS, SPORT + BUSINESS DEVT

NBA ENTERTAINMENT,
a division of NBA Properties, Inc.

By: *[signature]*
Name: Gregg Winik
Title: Executive VP, Programming + Executive Producer

WNBA ENTERPRISES, LLC

By: *[signature]*
Name: Robert Criqui
Title: VP

NBDL ENTERPRISES, LLC
By: *[signature]*
Name: Robert Criqui
Title: VP